Judge Branch, Judge Luck and I are glad to have you here so that you can help us out with this case. When you come up to the podium to speak, you can obviously take off your masks. If you're more comfortable leaving the mask on, that's perfectly fine too. You're familiar with our lighting system. When the yellow light goes on, that means that your time is drawing to a close, so begin to wrap up. If we take you beyond the red light, then don't worry about it. You're on our time and not yours. And with that, we'll begin with our sole case this morning, Gavin v. Commissioner of the Alabama Department of Corrections, this case number 20-11271. Okay, Ms. Hughes. May it please the Court, my name is Beth Hughes and I represent the state of Alabama in this appeal. We're appealing, in this case, Judge Godfrey's order granting penalty phase relief to Mr. Gavin. In this case, a fair-minded jurist could reject Gavin's penalty phase IAC claim, as did the Alabama Court of Criminal Appeals. In this case, the district court was wrong when it found that the CCA's decision was objectively unreasonable because it presumed that counsel's performance was sufficient even though it heard no testimony from counsel concerning his penalty phase strategy. You're saying that counsel had to testify? No, I'm not saying that they had to testify, but I'm saying that you can't presume that he was ineffective when there's no evidence from him, especially in this case where... I get your point that when a lawyer doesn't testify, that creates problems for the person alleging ineffectiveness. But the way you're describing the paradigm seems to say that if he doesn't testify, then you can't show ineffectiveness. And I thought when the US Supreme Court reversed the decision I wrote some time ago, they said that the Alabama courts did not have that sort of a rule, that we had misread Alabama law, and that Alabama courts permit you to prove an ineffectiveness claim, although it might be harder, but they permit you to prove an ineffectiveness claim without the testimony of counsel, say in a case where counsel has died. That's correct. That's correct. And I'm not arguing that. What I'm saying is in this case, there's not enough evidence to prove that counsel was ineffective without his testimony, because it's very important in this case, because the district court found that counsel failed to investigate. And we know that, in fact, he did conduct a mitigation investigation because he hired Lucia Penland. There was John Sturman, who Penland hired. There was a Dennis Penland, who was the investigator, and the attorney himself was involved in the mitigation investigation. In fact, he hired Miss Penland very soon after being appointed to represent Mr. Gavin. But then Gavin and his family completely refused to cooperate in the mitigation investigation. But again, I take your point, but that's not completely right either. Because at the end, and again, I take your point about the lack of cooperation. I think that's pretty well established in the record. But you can't say that they didn't cooperate at all by the time that the trial began, because Mr. Gavin's mother provided some information and helped with at least some of the educational records, et cetera, et cetera, right? That's correct. But we don't know when she started to help him. And in this case, it could very well have been that the family did not cooperate until the day the trial started when Mr. Gavin admitted for the first time that he was not guilty of this offense. So we don't know. We don't have testimony from counsel. What do you mean admitted for the first time that he wasn't guilty? That he was guilty, I'm sorry. Oh, okay, got it, got it. He admitted on the day that the trial started for the first time where he had maintained all of the time before that, that he was not guilty and continued to maintain that he was innocent even in the Rule 32 proceeding. So we don't know when counsel was able to get Ms. Gavin to talk. We don't know the extent of any of their conversations. We don't have an affidavit from Ms. Gavin. So you would say though that because we don't have counsel testifying, we have a deceased counsel and we have one counsel who wasn't called to testify, that in this particular case, the record is incomplete with regard to Smith's independent investigation or the actions he took in response to the information he received from Penland or others, correct? Correct. And so in those instances and under that factual situation, don't we have to presume that counsel acted reasonably and conducted an adequate investigation? That's correct, and that's exactly what the U.S. Supreme Court said in Dunn v. Reeves back in July and then looked at the facts that were possibly available to counsel. And in this case, we know that he didn't, I mean, as late as October 20th, counsel said that Gavin was completely unwilling to discuss mitigation and that his family was coming around to some extent, but we don't have any evidence as to what that extent was, when it happened or what information that counsel was able to obtain. And so we don't know, especially for Mrs. Gavin, who did testify, represented a ton of affidavits in the Rule 32 post-conviction proceedings. Can I ask you a more fundamental question? Yes, sir. Sort of taking a step back a little bit, but I think this discussion about the presumption is worth having, so let's come back to it. But I guess my question is, when we focus on especially the prejudice part of this, I know we're talking a little bit of deficiency, but on the prejudice part of this, who are we saying is the one who either would be or would not be affected by this? So obviously in the guilt context, we're focused on the jury, right? But in the penalty context, it seems to me that it's a little different, or is it different, I guess is my question. In Alabama, the jury makes an initial recommendation and then it's up to the judge as to whether it's a sentence. I mean, then he follows the recommendation. So is the question, again, just Strickland, taking a deep ad of it for the moment, is the question for Strickland purposes, the reasonable probability of a different result from the sentencer or from the jury? What do we look at in that context? I would think it would be in the sentencer because he has the final authority. Now, I know Alabama statute has changed over the years, like Florida's has changed, so I'm asking a place from ignorance, so I want you to educate me. At the time, I'm sorry. So in 1999, 2000, when this was going on, 1998, 1999, 2000, did the Alabama judge have the ability to override the jury, even if the jury had come back 9-3 as opposed to 10-2? Yes, he did. Okay. So is our focus then exclusively on the sentencer, meaning the judge who makes the ultimate determination based on the recommendation? Is it looking at the jury's recommendation and making the Strickland prejudice analysis? Who are we looking at in making that? I think you have to look at both. You have to see that the jury recommended death, and it wouldn't take a 9-3 vote. It takes an eight jurors to recommend death in Alabama. So a 9-3 wouldn't have done it. It would have been a hung jury. Wait. So I'm back to where Judge Luck was asking you about the exact statutory scheme that existed back then. We've had so many of these cases in so many different time frames that at least mine is confused about which one was present at which time. So at the time that Mr. Gavin's trial and sentencing proceeding went forward, what sort of a jury recommendation would have prevented, if any, the judge from sentencing him to death? There wasn't any. I think the judge, if it had been... If the jury came back 7-5 for life, what could the judge have done? He could have overridden the sentence. If you don't mind, let me take you through a couple of more numbers just to make sure I've got it right in my mind. If the jury came back 11-1 for life, what could the judge have done? The judge could have overridden and sentenced him to death. Okay. If the jury had come back 11-1 for death, what could the judge have done? The judge could have overridden the other one. Even if it was 12-0 for death, the judge could have completely overridden. That's correct. Okay. One last question, if you'll indulge me. Okay. Because Judge Luck and I have lived in the Florida world where, at times, the jury recommendation was given weight. And so my question to you is, as a matter of Alabama law back then, was the jury recommendation given any weight? Again, as a matter of state law. Right. I know you're telling me the judge could have overridden. I get that. But in overriding... So, for example, think of a 12-0 verdict one way, whatever way, and the judge overriding and going the other way. With Alabama law, say, you've got to really think about whether you're going to override when you've got 12-0 going one way or not. Or was it just de novo? Thank you for your recommendation, but I choose to go the other way. There were some cases, and I'm not sure exactly what year they went into effect. And I think, I'm not sure it was at this time, that you had to give the jury recommendation some weight as a mitigating circumstance. And that's why, and I guess I presume, I don't want to put words in your mouth, but I presume that's why you said you have to look at both then. Right. And I don't remember when those cases came into effect. Right now, I can't remember the name of the cases, but it did say that you had to, then, as a mitigating circumstance, give some weight to the jury's life without, I mean, death or life without recommendation. I guess my question, though, is as a matter of our law or as a matter of Supreme Court law or both, what has we said and what has the Supreme Court said regarding who we look at in determining the Strickland analysis? Because that, to me, is the question. Is it the ultimate sentencer, which in some states is the jury? Or do we look at the ultimate sentencer where it's the judge? Or must we look at both under the circumstances that Judge Jordan has said where the, again, assuming the law at the time is that the jury verdict is entitled to, let's call it great weight, some weight, any weight, weight. I think the ultimate sentencer in Alabama was the judge. I think you have to look to the ultimate sentencer to determine Strickland prejudice. We have cases. I don't remember if they're from Alabama or not, where a certain vote would have precluded a death sentence. We focus on whether or not the mitigating evidence could have swayed the requisite number of jurors to have precluded a death sentence. Do you recall whether or not those cases arise out of Alabama capital schemes or not? I don't. I don't remember, Judge, but I know that that is the law. I mean, I do know that there are cases out there that say if you don't, if you need one more vote. But in Alabama, you have to have 10 votes for a death sentence. I reckon it has to be 10-2. 9-3 wouldn't do it. So changing one juror's vote would not change the sentence in Alabama. Let me ask you to turn to the merits argument on prejudice if you can, because your time is going to run out. And I also want you to be able to address the Croth's appeal, too. Okay. This case was heavily aggravated. There were three aggravating circumstances. He committed the capital offense while he was under a sentence of imprisonment. Before Mr. Clayton's murder, he had been previously convicted of murder, which is another felony involving the use of violence. And he was also found to be that the murder occurred during a robbery in this case. So there's substantial aggravation in this case. And instead of looking and giving a presumption that every fair amount of jurors would conclude that there's substantial, not just conceivable, likelihood that the results of Gavin's trial would have been different, the district court in this case looked at Wiggins, Vompela, and Williams and reweighed the evidence before concluding that had all that evidence been presented, that there was a reasonable probability that Gavin would not have been sentenced to death or would have been sentenced to life without parole. On this question, I will tell you, it would be helpful to me to focus on not just the mitigation, but the mitigation weighed or affected by the contra evidence of mitigation. So, for example, Mr. Gavin testified contrary to a lot of the things that his mom testified to. I bet my mom sees my life a little differently than I saw my childhood. Right. And I imagine that's not unusual. Okay. In this case, you've got... And just to finish the loop there, I know some of the medical evidence was about institutionalization and was contrary to that. So, because as I understand it, if we are to reweigh, again, assuming Adeepa, wait for the moment, we reweigh it all, the good, the bad, the ugly, all of it. Correct. Correct. And the good, I mean, and they presented evidence of some abuse, that he had been institutionalized, that the family was poor, that they were in a violent neighborhood, but that's completely contradicted by Gavin's testimony at the post-conviction hearing and by what he told the state's expert, Dr. Glenn King, which... And there's no mention of this testimony by the district court in this case. In this case, Gavin said he paid the picture of a stable family, which he King, he said his dad was borderline abusive. He denied any sexual abuse. He told Dr. King that his parents were loving and that they lived together their entire life. The Department of Children's Services were never called to his home because of beatings or abusive behavior, and none of the children were removed from the home. What about the neighborhood? It was safe until he was nine or 10, and he said they didn't start locking the door until he was 12 or 13. He was not exposed to drugs until he was a young teenager. And there's a little bit of conflict between what he told Dr. King and what he said. It was from 11 to 13. The violence in the neighborhood, according to him, did not begin until he was 16 or 17. He told Dr. King that he was never in particular fear for himself or his siblings. While his family was not wealthy, the children always had food, clothing, and shelter. And the other thing was that Mr. Gavin testified that their power was only turned off once while he was living in the household, and that was because his mother forgot to pay the bill and immediately paid the bill, and the power was restored, which is also contradictory to the evidence that was presented at the Rule 32 hearing. In addition... What about the expert testimony and sort of weight between Dr. King and also Dr. King's what the two other doctors testified to? Well, it was also very different. Dr. King testified very similarly to what Gavin's testimony was. I don't think there was very much that was different except for the times that he told him. He said that he had no current or past problems with drugs or alcohol, and had only used marijuana occasionally. He grew up in a four-bedroom row house, attended the same schools, never repeated a grade, got good grades, and attended school on a regular basis. And he attended two years of high school before he dropped out in the 11th grade. There was some violence in the neighborhood, but it was relatively safe, especially in the first 12 years when his family did not lock the door. The family home was never broken into. What about the prison records as contrasted with the testimony about how well he adjusted to a 17-year life of crime in the Illinois state corrections facilities? Dr. King was of the opinion that institutionalization is not a diagnosis under the DSM, and also that it doesn't cause anybody to come out and murder somebody within three months of being released. What about what his prison record showed while he was in prison? Was it consistent with the testimony that he adjusted well, or was there indications that he had at least some issues while in the Illinois corrections? There were disciplinaries to begin with. He was apparently stabbed at some point in time while he was in prison, and he moved from prison to prison. I think he was in 12 different institutions in his 17 years while he was incarcerated. But Mr. Gavin either told Dr. King or testified that he asked for the move, that it was on him. He took cons courses while in prison. He described himself as a grandmaster in chess. He learned about plumbing, word processing, and served as a clerk in the law library. So he was given some training, and it does appear that he adjusted well to life in the penitentiary. And his request for the transfers was strategic on his behalf. Right. He wanted to move from place to place. I mean, he said he was bored, and so he wanted to move from institution to institution and was allowed to do so. How was the evidence of the prior murder conviction introduced? It was introduced on the guilt phase of the trial. He was charged with two crimes, murder and robbery, and murder within two months. I mean, within 20 years of a prior murder. It was introduced during the guilt phase. No, no, I get that. Thank you. Was it a certified copy of a judgment of conviction, or did someone testify about the specifics of that prior crime? How did that come about? It was all paper, but there was one... Wasn't there an arrest report of some sort? Yeah, and there was a description of the crime also attached, which is at Document 35-1 at 152, and it just describes the facts in the indictment, and there was a certified copy of his prior conviction. There was no testimony at the penalty phase about the prior crime. Or at the guilt phase. No, no, nothing. Just the exhibit came in. Just documents. With the documents. But, you know, had evidence of at the penalty phase, the state certainly could have called somebody to testify to the facts of this case, and we know that there was a disagreement. They got into an argument. Gavin made him walk out at gunpoint, walk out of the house where they were at the party, down the street where he was shoving him and hitting him with the guns, and he got behind a building, and while the victim was begging for his life in between the eyes. So that evidence we could have presented at the penalty phase in more detail and through testimony. But some of that, you say, was included in the arrest report or the incident report? Right. Yeah, well, the whole bit, but you could have had live testimony at the penalty phase that would have pointed to the fact not only that of this prior murder, but that he had gotten out in December and committed this murder three months later in March. So that certainly would have done away with institutionalization defense. And as far as the risk factors that Dr. Paramore testified to, Dr. King said that the risk factors were not, in this case, that, first of all, there's no studies to show that certain risk factors, except for substance abuse and mental health problems, would cause somebody to commit a murder. And in this case, he doesn't have any mental health issues. He doesn't have low intelligence. He doesn't have any mental issues at all that we know of that have been presented. And he was an adult. And was an adult and was 38 years old at the time he committed the crime. So what happened in his childhood would have been entitled to very little mitigating weight under this court's cases. If y'all have no further questions, I'll go to the second issue. And I will say that the Court of Appeals properly denied relief on this claim. I think you have to look at it as the way it was raised in the state courts because it was raised for the first time in a second amended Rule 32 petition that was filed after the circuit court had held an evidentiary hearing. He didn't present any evidence other than the allegations in his petition. He did not attach an affidavit. He did not attach a deposition. And there were no affidavits. No jurors deposed to present any evidence about that. Your opposing counsel says that for the reasons you're discussing right now, there was no determination on the merits on that claim. And thus, we need to review it de novo. Is that correct? No. Why is that not correct? Well, the Court of Appeals looked at it and said Rule 606B, which is very similar to the jury testimony, to attack internal influences. Potentially premature deliberations that occurred during the course of the trial have been held to constitute a potential internal influence on the jury. And in addition, they haven't shown, first of all, they don't cite any Supreme Court authority that says this is wrong. And the Supreme Court authority is actually that the Court of Appeals did the right thing in this case, Canada versus the United States. And then the Warger case said you can't present any evidence about the jury's deliberations. And that's exactly what the district court did in this case. So it's back to the de novo review. The way I see this claim is that it wasn't until Pena-Rodriguez that the U.S. Supreme Court said that a rule like Federal Rule of Evidence 606, Alabama Evidence Rule 606, could be overridden constitutionally in certain cases. For example, a case involving alleged racial bias. But that case was years after the Alabama Court of Criminal Appeals ruled in this case. That's correct. And they've never gone that far. Racial bias in that case was not an issue. And there's not any evidence of racial bias. Your opposing counsel suggests in their brief that the constitutional principle that was either unreasonably applied or had been clearly established and was contradicted here, was that a jury, they were required to have a jury that considers mitigation at the time of mitigation. In other words, that is qualified to and does consider mitigation. And here, the allegation is that the jury reached its mitigation verdict without ever hearing a drop of mitigation evidence, with only hearing the aggravation evidence. We don't have any evidence to support that. But let me say this. They have allegations. And again, because of the posture this was, it was dismissed. The allegations, as I understand it under Alabama law, we take those to be true and determine whether they're conclusively refuted or wrong as a matter of law. But those allegations suggest that that did happen. They suggest that, but then what they don't say in their pleadings is that any juror would automatically vote for death penalty, or that jurors during the penalty phase fail to consider the aggravating and mitigating circumstances as they were instructed to do by the trial court. So we don't have any allegation that that in fact happened. All we have is that they, without any evidence, is that they did not. Again, this doesn't go to whether or not the district court got it right or got it wrong. But going back to Judge Lux's question, if the jury renders a verdict before it has heard the evidence, and that's the allegation here, right? Yes. That's got to be wrong. I disagree. Let's put Ed Poddeffer to the side for a second. Okay. Let's put clearly established law to the side for a second. The jury comes back when they're given their initial instructions before they hear opening statements, and they write out a verdict. And that's the verdict they turn in. And they decide, listen, we're not listening to this stuff that's coming up for the next three days. And they turn in their handwritten verdict to the judge in three days later. Do you think that's kosher, that's okay? I mean, we don't have any law to say that it's not okay. No, forget law. Forget law. Let's just talk. Okay. Well, I don't... And the same principle. Again, it doesn't go to whether or not the district court got this right or got it wrong. But sometimes it's easier for me, at least analytically, to think of whether or not a claim would have validity without Ed Poddefference, and then sort of overlay the Ed Poddefference on top of it. It can't be right that a jury, after hearing only the guilt phase testimony, can return a verdict on the sentence without hearing the sentencing phase, right? It can when we don't... It can when they are instructed and there's no evidence that they didn't follow the instructions and that they didn't consider the aggravated... They weren't even given the instructions. I understand, but you have to look and see where they went. And where they went was that they were instructed to consider the aggravating and mitigating circumstances and that they had to weigh those aggravating and mitigating circumstances. They hadn't heard the mitigating. But I'm talking... I say that you have to go to the penalty phase. I don't think you can presume error from just what they did at the guilt phase. I think you have to know whether or not they properly weighed the evidence at the penalty phase before they returned their penalty phase. We have a disconnect then because I think the allegation, right or wrong, good or bad, legally sufficient or legally insufficient, is that the jury didn't do that, that the jury had predetermined what the sentencing recommendation was going to be before they heard the penalty phase evidence. And I think that's not the correct analysis. I think you have to go and see what they did in the penalty phase to determine whether there was any evidence, especially... And I'm going to just go back to the Supreme Court precedent, Tanner, where they said you can't... Even when the... And Tanner, and I'm over my time, so if you want me to finish. You can finish, I thought. Okay. And Tanner, the defendant, three days before his sentencing came and said, you know, I've got this evidence that jurors were drinking and were sleeping during the afternoons and the court said, sorry. No, no, but that's a different question. And then I'll let you sit down. And you've saved all your time for rebuttal. That's a different question of whether or not you can inquire and whether you can impeach. My question was more fundamental. And that is whether or not it's okay for a jury to do something like that, not whether or not you can impeach it later. I think that's a secondary question that follows. But thank you very much for answering the question. Thank you, Judge. Thank you. Okay, Mr. Conrad. Good morning, and may it please the court. Neil Conrad on behalf of Petitioner Appellee Keith Gavin. So far, there's been a lot of discussion about the details of the mitigation evidence and some of the details of the Rule 32 hearing testimony. And I want to get to that because it's important. But I want to take a step back for a moment and talk about what actually happened at trial. Counsel, I apologize for interrupting you. And I want you to get there. You have your full 30 minutes. But there are a couple of things I need to ask you to be satisfied that I understand what happened here. Absolutely. So I'm going to break it up into two categories. The first is what the district court did with the deep indifference. And the second is on these presumptions that we started talking about with your opposing counsel. Okay, just so you understand where we're going. Thank you, Your Honor. So I want to break it up both with regard to what the district court did with the deep indifference for deficiency and for prejudice. So deficiency, I'm looking at page 128 of the district court's order. I'll read it to you. But if you want to pull it up, I understand. The key sort of the key graph, the key paragraph seems to be right at the top of that page for deficiency where it says, trial counsel did not conduct an adequate background investigation, did not pursue all reasonable available mitigating evidence, and did not make a reasonable effort to present the mitigating evidence they had. Mr. Gavin has clearly established that counsel was deficient under Strickland. So in other words, the trial court goes directly to Strickland. And then says, because it did that, it follows that the CCA, I'm using that as a shorthand for Criminal Court of Alabama, that the CCA's findings to the contrary is objectively unreasonable. That seems to be completely, utterly wrong in every possible way. I disagree, Judge Luck. I think you have to look at that in context of the rest of the opinion. I understand your point about that. Here's the issue with that. And I know where you're going because on page 31 and 32, it sets out the correct standard. But the Supreme Court has told us that other circuits, other circuits reviewing district courts have said that exact scenario where you sort of back end the right standard, but in the middle clearly don't apply the right standard is not enough. Judge Luck, I think a big difference in this case is that you can see from the evaluation of all the other claims that she is totally understanding that pedeference and applying that standard throughout. So unlike in the case of... Isn't that an indication, and I agree with you, by the way, if you read the whole order, it does follow that. Doesn't it indication that here with this particular claim, the one that we're here, that something went wrong when it was done correctly in all those other claims? No, I think this is just a case where she used shorthand in one very small snippet of a much larger order that clearly showed that she understood as a deference. The counsel, that's not shorthand. She went directly to the Strickland issue. I mean, that's not shorthand. She went through in detail. You lay it out page after page of why there was deficiency and then said there was deficiency. And because there was deficiency, it's not objectively unreasonable. Judge Luck, I totally understand your point. But it's not that she just jumps there and gives the passage that you just read. It's that she grapples with everything that the state court said. She quotes it. She talks about it. She goes through every single reason. Now, I understand there are some other cases that are distinguishable where the district court jumps immediately to the Strickland issue and basically does a de novo analysis and does not grapple with the actual reasons provided by the state court. But that is not what is happening here. She does grapple with every reason that the state court provided. But the problem is it's not enough to grapple with it. The question is, in other words, it's not enough to look at the record to say, here's what the state court gave. I don't think the record supports that or I think it's wrong for this reason, that reason. The question is, and it's something she never mentions in this section, of could a fair-minded jurist have reached the same conclusion the CCA reached? I understand she does not say those words in that particular passage, but that is the standard she applies throughout. And more importantly, Judge Lutz, let's say at the end of the day, I can't convince you on how to read that part of it. It doesn't matter because she did grapple with every single reason and explain why it would be unreasonable. And ultimately, under EDSA, this court is ultimately reviewing the state court decision. I mean, of course, the district court decision informs that. But if we are able to establish that the state court decision is unreasonable. You and I are on the same page on that. So we'll get there. And I want to get there. But to me, it's pretty critical because I will tell you, there's not a presumption of correctness that district court orders in federal court. But I take a lot of weight in what a district court does, especially when she writes a 200-page order. I mean, that's a big deal. And so I want to look at that thoroughly. And so that's why I'm talking about this. But you and I are right. At the end of the day, this is de novo. And if you can convince me that there was an unreasonable application of Strickland by the CCA, then you win on that issue. But let's go to prejudice, page 133. And I'm going to call that the critical graph of the order on the prejudice side. After reweighing the considerable evidence offered in aggravation, and then there's a list, there's a hyphen and then a list. So I won't read the hyphen. I'm going to dot, dot, dot. But she does a list. The court concludes that if counsel had not performed efficiently, but it offered this evidence at the Rule 32 evidentiary hearing, a reasonable probability exists that he would have been sentenced to life imprisonment rather than death. In other words, directly to, she even says, I'm reweighing the evidence. And then says, because of numerous Supreme Court cases, the ones that we discussed, Wiggins, Rompilla, Porter, those cases, the Alabama, the CCA's contrary finding is an unreasonable application of Strickland. It seems to be the same mistake. Your Honor, my answer is essentially the same. And I don't want to spend too much time on it because I think we can win for the reason I just described. You're right. That particular passage doesn't mention the fair-minded disagreement standard. We don't dispute that that applies. Clearly that applies. That's clearly established. But we satisfy that standard. And one thing on prejudice in particular, it really doesn't matter what the district court said on this particular issue because there can be no serious dispute that the state court's application of that standard was just demonstrably wrong. It doesn't include the reasonable probability language. So you're not even applying epidefrance when you do the analysis of prejudice here because we have clearly satisfied 2254-D. All right. So let's get closer to the merits. So the second category I want to talk about is looking de novo, looking at the CCA division, sort of not giving deference to what the district court did here. And to me, it gets to where we started the conversation with your opposing counsel, which is the presumptions. So as I understand it, under the facts and circumstances of this case, there was never a factual determination by either the state habeas court or the CCA about the extent of Mr. Bainsmith's investigation. Is that true or not true? That is not true. There are factual determinations about what he did, when he did, how he contacted. I'm talking about the extent. You're right that he did things, but the extent of it. In other words, if we look at the extent as a big circle, there are some little circles about things he did. But do we know the entire, is there a finding about the entire circle? Again, Your Honor, I don't know exactly what you mean about a finding about the entire circle, but this is not a case where there's an incomplete record, a silent record, a factual vacuum, because we know from the record, because he said in open court, he calls two witnesses and only two witnesses during the penalty phase mitigation case. The first one is the mother. He admits in open court, in front of the jury, in language that could hardly be more prejudicial, because this is the capital defendant's own attorney saying this in front of the jury, I did not prepare you. Then he asked him open and determined. That's not a question on the extent, taking it at face value. That's not a question on the extent of the investigation. Let me give you an example from your own record. I'm looking at docket entry 35-50 at pages 93 and 94. This is the state habeas testimony, the rule 32 testimony of Ms. Penland on cross-examination. Ms. Penland's asked, you didn't do all the mitigation work, did you? And she responds in part, I mean, in this case, I obviously didn't. Later on, she's asked, so obviously, you were not doing all the investigation for Mr. Smith, were you? I didn't do that, she answers. Question, and you don't know the extent of the investigation work he did on his own, do you? I don't. Question, you weren't in his office every day, you don't know who he spoke to. Answer, I don't know the extent of the investigation that he did. As I read the state habeas court's fact findings, the state habeas court said, we don't know the extent of the investigation that he did on his own. And where we don't know, don't we have to presume that it was not deficient? So two responses, one on the Penland testimony, that's just her. Of course, she cannot testify as to everything else someone else did, but she's not the only source of evidence on that. Counsel, that's not just her. I mean, you all put her on to show the deficiency here. I mean, she's the one that testifies to what the breadth of the investigation is. And her testimony is, yes, I did some, I was tasked to do some things, but I have no idea the extent of what he did. That is not the only evidence we put on. That's not the only evidence in the record. That's just what she says from her perspective. The record from other pieces of evidence is absolutely clear. He did nothing else. He doesn't contact her for four to five months. She asked him multiple times to provide records. He never does. That's absolutely clear from the testimony. And there's no contrary state court finding to that. Why is it not an indication that he had other investigators or the second attorney, or he's on his own doing a lot of things and getting those same information? He didn't. During the testimony, during the penalty testimony, she's asked whether he ever provided records to her at any point in time. Her. But how do we know what he did outside of her? There are no records that he, in this record, that he provided to anyone. And one thing that's absolutely critical to keep in mind is that he actually writes a letter to Judge Raines, to the state trial court judge, right before the trial starts. And he says, here's everything I have. And he said, it contains no usable mitigation. I've read the letter. He says, here's everything I have. Because the judge wanted to know what this, the agency hired the, it's Ms. Penland's agency. I apologize. I don't remember the name. The prison project. I want to know everything that she did. And he sends her, this is what I have from her. Although he doesn't attach, for whatever reason, the Stumber, the Strumber reports, which come in later. And he sends the billing records regarding that. That is not. He doesn't say, this is all the mitigation I have. I have nothing else. I've done nothing else. That's never said, is it? The statement, the second part of the statement that Your Honor is referring to is much broader than that. Remember, the Sturman memos come in through a fax or a letter from Penland to Smith. So that's part of the Penland materials. So even if you can screw it narrowly, that he's only talking about Penland, he says there's no usable mitigation evidence. And then what do we see at trial? He shows up at trial. He doesn't present any evidence whatsoever. No substantive mitigation evidence. He only calls two witnesses, one of whom he admits on the record he doesn't prepare. So let's go there because you've taken us there. So the state habeas court said, and the CCA sort of does a general finding. So we look through that to what the state habeas court did. State habeas court says, that was a pretty darn good reasonable strategy because in Cherokee County, the defense that they wanted to put on wouldn't have really gone over very well. And a mercy defense was much more effective and would have been much more effective. Why don't we presume that counsel's choices without knowing the strategic decision that was made, again, the record's silent on that, not through no fault of your own. Why do we have to presume that that is not a reasonable choice? And that is the choice he made. So three responses, Your Honor. Number one, the record is absolutely clear. He did not conduct an adequate investigation in order to make an informed decision among strategy. That's number one. That's clearly established from a whole line of cases. Number two, the standard on Strickland is objective. It's not about what an idiosyncratic particular fact finder would find in a particular time at a particular geography. And the question then is whether or not what he did was objectively reasonable. And it's not for all the reasons we provided. Not just that the investigation was inadequate, but he actually said things that were affirmatively harmful. I mean, he asked open-ended questions to Mrs. Gavin and the testimony there was not helpful. And then when he was introducing the Reverend, he gets the name wrong. And the record is clear from an affidavit in the record from Reverend Johnson that he met with the Reverend only one time, three days before trial, and only spoke with him for five minutes and didn't ask questions other than, what are your impressions? This gets to a question I asked your opposing counsel and I want to pose to you. And I hope you have some specific case law or statutory authority that I can look at. So who do we look at on the prejudice analysis? Which is what we're talking about here. Do we look to the jury recommendation and what effect it would have had on that recommendation? Or do we look to the ultimate sentencer who here is clearly the district court, I'm sorry, the state trial court judge, who happened to be the same judge at the habeas who said this would have had no effect on me. And I think one of the things I want to add to that question is he had, unlike the jury, the Sturman reports, which had not everything, but had a lot of what we're talking about here. At least sketched out. So if that fact finder had a lot of this and said, none of this would have made a difference. It didn't make a difference to me there and it wouldn't have made any difference to me later. How is that? How do we say that that is unreasonable? So there's a lot of there. Let me unpack it. Number one, the first part of your question. I think under the law, you have to look at both because this is a sentencing regime where ultimately, as the state explained, at the time, the judge could have overridden the jury recommendation. Do you know the answer to the question that Judge Jordan asked about what statutory law at the time had to say about the weight? Or it would have been case law. Could have been an interpretation of the statutory scheme by the Alabama courts, too. But was the jury recommendation entitled to any weight at that time? I confess, I don't have a statutory side on that point. I do think it's clear from the case law, not just from the 11th Circuit, but from Alabama courts, that it's entitled to some weight. And clearly, even if you can't point to a statute that says that or a case that says that, I mean, we all know that's true. I mean, even in this case, the judge considered the jury recommendation as part of his findings. It goes into the analysis. So I think you have to consider both. Second thing, though, both the judge and the jury had an incomplete sentencing profile in mind. Because as you said, he looks at the Sturman report, but the Sturman report is really just a roadmap for evidence that could have been developed, that should have been developed. And that's, by the way, that's precisely the kind of thing he could have spoken to Mrs. Gavin about before she was called to testify, because a big part of the Sturman memo is an interview from Mrs. Gavin, which shows that she was co-op. See, the problem is, for me, that cuts against you a little bit, because that seems to indicate he did know, and this happens in Florida, because Florida has a similar scheme. There's stuff you want to tell the judge that you don't want to tell a jury, right? Because some things don't work with a jury that are going to work with a judge or can be risky. And so the reason for you have, in Florida, it's called a Spencer hearing. You have the Spencer hearing separate from the jury, because the judge is the ultimate sentencer, and you can provide mitigation in addition and separate that you wouldn't present to the jury. Doesn't that sound like a reasoned choice? It's not a reasoned choice here, because we know from the letter that he sent to Judge Raines before the trial, when he had the exact same memo, he said, it's not usable mitigation evidence. And then nothing changes. He doesn't do any other investigation. He doesn't do any other work. He doesn't develop the details in that memo. So even if you're looking at both the jury and the judge, he does nothing to develop a clear lead that he had that told him, here are things you should consider. And that evidence is absolutely critical. It's much better than the state gives it credit for, because it goes to humanizing characteristics of the defendant. It goes into his dysfunctional family upbringing, the gang-infested neighborhood that he was part of, the fact that even though he was exposed to this, he was actually a loving brother and sibling who really tried to protect his siblings and his brother. And in fact- So I have two questions regarding this. So what Strickland says is, it's reasonable under the circumstances. So not reasonable, it's objective, but it's also under the circumstances. The circumstances here, as I understand it, and both as a matter of finding, as a matter of record, is there was significant lack of cooperation up till about two weeks before. And I know it's sort of in the air of what happened two weeks before. And two weeks before, there seemed to be some sort of breakthrough and some stuff happened. I went back and looked at the state habeas, I'm sorry, the state trial court's order, and there was this issue of the continuance. The state trial court found at the habeas stage, God bless you, and going back to its order, and I'm looking at a docket entry 35-5 at page 132, quote, in any event, this case will not be postponed to await the work of the Alabama Prison Project. That was from May 10th, 1999. So you had a judge who was not continuing anything, you had a family that wouldn't cooperate until two weeks before, and still he gets a good amount of information that he then uses at least at the, at what I'll call the Spencer hearing, but at the judge phase of the penalty phase. How is that not reasonable under the circumstances? A couple of responses, Your Honor. Number one, after he gets that order from the court that you're referring to, he does nothing. He doesn't contact Penland the entire time. He doesn't check in to see how is the mitigation case going. He doesn't respond to the request that she had already made to provide some records to him. He does nothing. So this moves closer to trial. Now we know that the family is cooperating, and I think it's two to three weeks. I think the timing's a little fuzzy, but he has time to do work, and we know the family is cooperating at that point, and we know from the record that Mrs. Gavin actually comes and is put on, and he doesn't prepare her. That is clear from the record. This is not a factual vacuum case. This is a lawyer who's gonna try a case too. This is exactly why you don't look at hindsight, but having, I hate judges who come and say when I was a trial judge, when I was a trial lawyer, but when you try a case, you're doing a lot of things, and it's hard to be able to stop, take a flight to Chicago as you're trying to prove the innocence of a guy who has a serious innocence claim. I mean, you all present it. There's a serious innocence claim here. So he's trying to get his guy off, and to stop, turn around when this family hasn't cooperated from the beginning to then go full stop of mitigation when he has some of this information. I just, it's hard for me to do the look back, which we're told not to do, to say that that's unreasonable under those circumstances. I understand you can't do hindsight, and I understand that trial counsel is busy. He's juggling a lot of different priorities, but this is a situation where he literally does nothing, and if you're struggling with the prejudice question, I think one really critical piece to keep in mind is what he- I have a question to ask you when you finish that thought. Sure, I just don't want to lose sight of this fact, because I think this really does help make this case the rare case where not only EDPA is satisfied, but habeas relief does really, is warranted, and it's that on top of the lack of preparation that went into the two witnesses he called, and we talked about all the problems there, then he gives the closing argument, and what does he say? He effectively undercuts the mitigation case against his client. His own attorney, essentially through the case against him, telling the jury that the night before he had searched through all of his files, just looking for something, anything, one last shred of persuasive evidence that he might place before the jury to spare Gavin's life, and in his own words, I came across a couple things, but nothing that seemed appropriate, so I really have nothing of that nature to share with you. It is hard for me to think of anything more damaging than a capital defendant's own attorney standing up and telling the jury, I looked for mitigation evidence, sorry, I came up empty. That's the kind of thing that you cannot justify as a strategic decision, and again, that's not the only evidence, but it's a really important piece of the puzzle for this prejudice analysis, because the cases are absolutely clear. The prejudice inquiry here is weighing what actually happened against trial against what could have happened if a reasonable investigation, reasonable preparation had happened, and that chasm here is enormous. Let me ask you the question now, because you're gonna run out of time, I want you to be able to get to the claim that you're cross-appealing on. In the last decade, the Supreme Court has told us that reasonable probability of destriction means, and I'm summarizing, a substantial, not just a conceivable likelihood of a different outcome on the prejudice front, right? That's right. Less than a preponderance, but it has to be substantial, not just conceivable. Correct, and believe me, we've struggled with those terms, and trying to figure out where in the literary chasm they fall is a difficult exercise. Totally understand. But that's what the court has said, so that's what we've got to grapple with. Now, the Rule 32 Court and the Court of Criminal Appeals, and again, I'm summarizing, basically said that the new mitigating evidence, the evidence that could have been but was not presented, would likely have been given little weight by the judge or jury, given the aggravating circumstances and the overall panorama, right? You're correctly characterizing the record as far as I know. That's what they said, okay. So, it seems to me that if we were doing de novo review, you would probably have someone who was aligned with your position on prejudice. But we've got epidefference layered on top of the substantial, not just conceivable likelihood standard. So, tell me why you believe that the state court's prejudice determination warrants habeas relief given the epidefference that we must provide. Two things. One, we satisfy 2254D right out of the gate because it applied the wrong standard. So, you're not even doing this inquiry. But two- They don't have to state the standard. I'm sorry? A court doesn't have to state the standard. But here it stated the demonstrably wrong standard. It said it would have changed the outcome. That's not the standard. And we cited cases in our brief from the Supreme Court and the 11th Circuit where the cases have said specifically that is contrary to clearly established law. So, we satisfy 2254D. But to address the rest of your question- Don't we look through, though? I mean, it's really, this is about as bare bones of a prejudice finding as you get. And as I understand sellers, we're supposed to look through to the state habeas court in those circumstances. And there, the state habeas court did, say, use the right terminology, right? I disagree, Your Honor. You don't look through here because you don't just have a summary disposition. You're not in the land of a summary disposition that's governed by Harrington versus Richter. Here you have a reasoned explanation, and there is real explanation there. It says that it discounted the value of the mitigation evidence because of where he was from and what his age was. And that's unreasonable for the state court to do. Again, all the court said was the evidence presented at Gavin's Rule 32 evidence here hearing was to a great extent centered around his childhood in Chicago and imprisonment and likely would have been given very little weight by the jury. So, a couple of points here. Number one- Likely would have been given little weight. That doesn't seem to me to be wrong, demonstrably wrong articulation of the standard. That's not where it's actually articulating the standard. The standard comes in the rest of the paragraph. I'm trying to address this specifically, which is number one, it was clearly established that individualized evidence about the defendant's background was constitutionally significant. And if it's omitted, could give rise to prejudice. Number two, Porter and other cases clearly show that you can't discount to a relevance evidence of a capital defendant's background, even if he's old, relatively old. In Porter, the capital defendant was 54, which is much older than Keith Gavin was at the time of trial. Can I ask you a question? Sure. You want us to read the district court's order, which we reviewed de novo as a whole to include statements that were, did correctly set out the standard. There are lots of places in the CCA order where the court correctly stated the prejudice standard. You would agree? I do not. If we're talking about the court of criminal appeals decision, I do not agree. If you're telling me nowhere in that order did the court set out the correct Strickland standard. Nowhere in that order does the court use the reasonable probability language, which is absolutely key on this point. But I don't think our case rises or falls with that because as I've said, we've given you reasons why we think we satisfy 2254D under clearly established law for the reasons we talked about in the brief and what I just described. I do wanna go to the juror misconduct claim because I think, sorry, the last thing I'll say on prejudice, the state talks about Dr. King's testimony and says, you know, some of this was conflicting, but a key part of Dr. King's testimony is that he ultimately agreed with us on the conclusion from our expert, Dr. Haney, on the importance of institutionalization, where he says that Keith Gavin was almost a model prisoner and cases like Skipper versus South Carolina make clear that that kind of evidence is significant in the sentencing context as well and that's something the state doesn't have a good answer and that's part of the mitigation profile here and also goes to prejudice and I think really significant. On the juror misconduct claim, the state really has not responsibly addressed our position at all and I think this came through in the court's questioning here. The claim here is that he was denied a jury's consideration of mitigation evidence at all because they voted on his sentence before they were instructed, before they heard any mitigation evidence. We have cited several cases, including a case from the ETPA context that makes clear a jury in a capital case has to be able to give consideration of mitigating evidence. I know, but the whole rationale of the Alabama Court of Criminal Appeals was that you really could not get that evidence out through juror testimony because of Alabama Rule 606, right? That is what the state court said. That's why it's not an adjudication on the merits. The 2254D doesn't apply. They don't grapple with the constitutional claim here. But two, on the more pragmatic point, we have cited many cases that the state does not even mention, does not even grapple with in its reply brief where case after case the Supreme Court has said, you've got to accept as authoritative the state court's determination of its own law. So we're not disputing that because we're in federal habeas, but you still look to see whether or not the way that it's being applied infringes on a weighty interest of the accused. Here it does for all the reasons that the court mentioned during the state's opening argument. And then the question is, is the way it's being applied, is that arbitrary and disproportionate to the state interest here? And clearly it is. Ultimately, we really disagree with how it was applied here because this isn't a situation where the juror evidence would impeach. Don't you have to show that through that clearly established law at the time would have allowed Alabama Rule 606 to be overridden because of a constitutional interest, your interest in having a jury decide a case based only on the evidence presented? No, that's not the right standard here. 2254D does not apply. So we don't have to talk about clearly established law. This is a de novo review. But even if you did, it is clearly established at the time of the state court's decision that you can't have a jury decide based on something other than evidence. Again, no evidence was before them. We cite lots of Sixth Amendment cases that go to that point. And as I understand the state's brief- Isn't the, let's do de novo, let's sweep past clearly established and the issue that was raised. Your opposing counsel says, and in reading the allegations of the petition, it seems to be there, that there's no, the clearly established law or the law we would apply is that the jury and the law you cite is that you can't see the jury that will not consider mitigation. That's sort of the underlying law here that we're applying, right? I'm sorry, I missed, I didn't hear the last part. The underlying law we're applying de novo is that you're entitled to a jury that says that it will consider mitigation. In other words, what you can't have is a juror who says, I'm gonna convict. And when I convict, you're gonna get the death penalty, right? That's what you're not allowed. It's not just that. It's that there are cases that, again, different context, but the principle is clearly established. Like if a state passed a statute that said the jury can't even be allowed to consider evidence like that, that doesn't have to do with how- I'm not talking about the rule. Yeah. I'm assuming every allegation, assuming the juror would testify exactly as you alleged. Right. The law that you're seeking us to apply de novo is that a juror, you are entitled to a jury, your client. Your client is entitled to a jury that will consider mitigation after a finding of- Is it okay if I continue to ask questions? No, I'm gonna cut you off. No, of course not. Thank you. No, no, it's important. Sorry, sorry, chief of the panel here. So I need to get permission. I understand. You're entitled to a jury as a matter of the constitution to one that will consider mitigation. As I understand it, the allegations, even taking everything the juror said,  the jury never said we would not consider mitigation. It's that we took a preliminary decision, a poll, and then we sat and heard everything. And as we cite cases, and this is the other part of the principle here, is that if you reach a decision before, you're not impartial. This is more than just forming an impression. This is an actual vote. And it's the whole jury doing it together. Again, the claim that I read here that was litigated below and litigated here is you're entitled to a jury that considers mitigation. It's wrong that, in other words, if during Guadire, a juror said, this is where it often comes up. Sorry, let me finish. And then you have the time. This often comes up when a juror during Guadire says, if I convict, if I'm convinced beyond a reasonable doubt, this person's going to the chair. Those are the sorts of Guadire you see. It is unconstitutional to seat that juror because that juror will not consider mitigation. That's the case while you're relying on because these jurors didn't consider mitigation, except that they did. This is absolutely critical because I want to make sure this is clear. That is not the only principle at play here. The other principle here is that you can't prejudge a sentence. You can't rely on preconceived notions about what the sentence or what the verdict will be. We cite lots of cases on that point too. So it's not just the cases that are specific to the capital sentencing. If we don't take... There are legions of cases, both in our court and elsewhere, that just because a juror takes a preliminary poll or said something of, based on what I heard right now, it's not looking good. That is not... We have never ever said that that juror is required to be struck or is per se unfair. This is more than that. This is not just a single juror or a few jurors. This is the entire jury coming together and actually casting votes on the sentence, secret ballots. That is a collective act by the jury. That is a prejudgment. He did not get a real jury because they had already prejudged the sentence. And you're right. The penalty phase happens, but we have pointed out that they have prejudged the sentence so he didn't get a real impartial jury to determine his sentence. For all those reasons, we ask that you affirm the district court's judgment. Do you have anything else, Lisa? All right, Mr. Conrad. Thank you very much. Thank you for the extra time. I appreciate it. Okay, Ms. Hughes, you've got your five minutes of rebuttal. Thank you, sir. Judge Tucker, I want to first say that you're completely correct that the district court applied no ad for deference. To the ineffective assistance of counsel claim, there was never any discussion. I'm just not sure how much. First of all, I don't think that you want us to reverse and remand for a proper application of a DEPA. And I just think that your opposing counsel has this exactly right. This is, we're reviewing this de novo. We would review it de novo anyway if the district court had come out the other way. And so the real question is, and you should get to is, was there an unreasonable application of Strickland at the prejudice and the deficiency stage? And there was. There absolutely was in this case. I just want to cover a few things that opposing counsel said. First of all, that concerning Annette Gavin's testimony, that the attorney basically said that I didn't prep you for your testimony. We don't have any evidence from this attorney as to why he did what he wanted, why he did what he said, why he said could very well be that he was trying to convey to the jury that he was not putting words in Ms. Gavin's mouth, that he wanted the jury to believe that her request for mercy was authentic. We don't know. For me, that's one of your least persuasive arguments. Okay. Because any lawyer worth his or her salt, if that lawyer is going to rely on a theory of asking the jury for mercy, and I don't mean by prep that you're going to sit down and give the witness a list of all the questions and make sure that the answers are exactly what you want, but you're like, listen, I'm going to ask you about this generally. I'm going to ask you about his childhood. I mean, you don't put on witnesses, your witnesses, without some preparation. Well, you do when you know what you want to get from them and that you want it to be authentic and you want the jury to see that it's authentic. And also, we know that this was an attorney from this area who knew Cherokee County juries. And as the judge said, wouldn't have been swayed by the evidence that was presented at the post-conviction hearing, that putting on more evidence of his institutionalization or that he was raised in a violent place when he was a child would not be considered mitigating evidence by the jury in this case. I also want to address the argument that the closing argument in this case cut against his- Can you focus on something else that I think is an issue for you? Okay. And that is your opposing counsel says the CCA applied the wrong Strickland prejudice standard. Is he right? No, sir, he's not. Tell me why not. Because what they did in that case, what in this case was to, what they said was they conducted a de novo review of the circuit judge's prejudice determination, reweighed the omitted evidence against the evidence that was presented during the trial and found the gathering was not prejudiced. And that's the correct analysis under Supreme Court precedent, specifically Sears v. Upton, where the court said to access the probability of a different outcome, we consider the totality of the available mitigating evidence, both that adduced at trial and the evidence adduced in the Hague is presented and reweighed against the evidence in aggravation. Did the CCA elsewhere state that it would not have changed the verdict, which is obviously the wrong standard? Yes, it did. I'm actually not sure about that, Joe, so I don't wanna say that. It says little weight, but it also says would not have changed the verdict. It has both. Right, and so they got it right and they got it wrong. I mean, unfortunately we had this happen. That's what the district court did too, right? Well, the district court did not in all the conductance analysis. It's the same question that Judge Luck asked your opposing counsel. You can't have it both ways. You can't say one order which says something a little wrong and a little right has to be read holistically. And then you can't take the other order and say a little right, a little wrong, but I want you to read the wrong and not the right. I think if you look at when the actual district court's discussion of prejudice and deficient performance that she did not conduct the proper analysis on those two. Right, that's a different argument. And I'd also like to quickly talk about issue two. And the only way to get to the juror misconduct issue in this case is to inquire into the validity of the verdict, which the Supreme Court has said over and over again, you cannot do. And the case decided by Gavin is Judge Luck, you understand, are cases where it's voir dire and not cases where something happens in the middle of the trial. And in this case, there's not any evidence that the jurors indicated. I don't think it, let me be clear. I don't think it has to be voir dire. I think if the evidence was, if there were allegations where a juror says, I don't care what these guys say in the next phase, you know, I'm imposing the death penalty no matter what. And the juror took a vote and that was it. I think it would be a lot closer of a call. But we don't have that in this case. We don't have any evidence. Or any even allegation that that occurred. For the reasons set forth in our brief and in the oral argument today, the state of Alabama respectfully requests this court reverse Judge Favre's decision and refuse to grant any penalty for his release. Thank you. All right. Ms. Hughes, Mr. Finerad, thank you very much. The arguments were very, very helpful and we appreciate your being here to help us out in trying to figure out this case. We're adjourned. All right.